**BRITTON et ux. v. COTTON STATES PETROLEUM CO. et al. (No. 7551.)**

(Court of Civil Appeals of Texas. San Antonio. April 17, 1926. Rehearing Denied May 12, 1926.)

1. **Mines and minerals** ⬤⇒74—**Duty of assignee of oil lease to drill held to be determined only by bond to plaintiff, where neither assignment nor lease made reference to drilling contract between plaintiff and original lessee.**

Where drilling contract with lessee was not referred to in oil lease or assignment of lease to defendant, and was not made part of defendant's drilling bond, its covenants did not become part of lease, and defendant's obligations to drill are to be determined only by provisions of his bond.

2. **Mines and minerals** ⬤⇒109—**Bond obligating defendant to diligently complete well as begun requires drilling to depth reasonably necessary to ascertain if oil in paying quantity underlaid surface.**

Bond obligating defendant to diligently proceed with and complete well as located and begun requires drilling to whatever depth is reasonably required to ascertain if oil or gas in paying quantity underlaid surface, or to that depth at which product was usually proven or disproven in particular locality.

3. **Mines and minerals** ⬤⇒109—**Whether oil company drilled well to depth reasonably necessary to determine existence of oil within reasonable time held for jury.**

In action on drilling bond, whether oil company drilled well to depth necessary to determine if oil in paying quantity underlaid surface within reasonable time was an issue of fact for jury.

4. **Damages** ⬤⇒77—**Intention of parties will be given effect in determining whether amount designated to be paid by obligor if he defaults is a penalty or liquidated damages.**

In determining whether amount designated in drilling bond to be paid by obligor in event of his default is a penalty or liquidated damages, intention of parties will be given effect.

5. **Damages** ⬤⇒78(1)—**Whether amount stipulated in bond is intended as penalty or liquidated damages depends on language used, nature and object of transaction, and surrounding circumstances.**

In determining intention of parties to fix damages in drilling contract in event of obligor's default as a penalty or liquidated damages, language of bond, nature of transaction, object to be obtained, and all surrounding circumstances will be considered.

---

⬤⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**6. Damages ⊙⇒78(1)—Amount stipulated in bond to be paid in case of default will be treated as penalty, and only actual damages recoverable unless clearly expressed or intended as liquidated damages.**

Unless sum stipulated in bond is clearly expressed or intended by parties to be liquidated damages in case of default, it will be treated merely as a penalty or maximum amount recoverable as damages, and recovery will be measured by actual damages sustained.

**7. Damages ⊙⇒79(1)—Arbitrary sum fixed as liquidated damages in contract under which damages cannot be determined will be treated as liquidated damages if injury occurs by breach of contract.**

If damages for breach of contract cannot be ascertained, stipulation in contract for a specific sum in case of default, arbitrarily fixed as liquidated damages, will be so treated if obligee in bond has been injured by breach of contract.

**8. Damages ⊙⇒85—Obligee suffering no damages by obligor's default cannot recover, though bond stipulates for liquidated damages, unless purpose is clearly expressed.**

Obligee suffering no damages as result of obligor's default cannot recover damages, though bond stipulated for liquidated damages in sum certain, unless purpose is clearly expressed in bond.

**9. Damages ⊙⇒79(1)—Uncertainties in results from drilling for oil are to be considered in determining damages and intention of parties in fixing a penalty or liquidated damages in case of obligor's default.**

Uncertainties in advantages resulting to landowner from drilling for oil are to be considered in determining damages and intention of parties in fixing amount in drilling bond to be paid by obligor in case of his default as liquidated damages or as a penalty.

**10. Mines and minerals ⊙⇒109—Evidence held to show that lessor suffered no damages by time consumed in drilling well, and was entitled to no damages for breach of drilling contract.**

Evidence *held* to show that lessor suffered no damages by reason of long time consumed by lessee in drilling well to a dry hole, but in fact profited therefrom by sale of royalties on prospect of finding oil, and hence was entitled to no damages by breach of lessee's contract to drill.

**11. Damages ⊙⇒85—Obligee under drilling bond can recover no damages, where he suffered no injury by obligor's default, in absence of agreement that sum was to be paid as liquidated damages regardless of injury.**

In absence of agreement that sum named in drilling bond was to be paid as liquidated damages in event of default by obligor without regard to injury, the obligee cannot recover, where he suffered no damages by reason of default.

Appeal from District Court, Dallas County; Louis Wilson, Judge.

Suit by G. S. Britton and wife against the Cotton States Petroleum Company and others. From a judgment on a directed verdict, plaintiffs appeal. Affirmed.

Chandler & Pannill and J. A. Johnson, all of Stephenville, and Currie McCutcheon, of Dallas, for appellants.

Spence, Smithdeal, Shook & Spence, of Dallas, for appellees.

SMITH, J. On February 16, 1918, William Heard obtained oil and gas leases from G. S. Britton and 16 others upon their lands in Erath county, situated near the Desdamona, oil field. These leases were in the usual form of such instruments, and obligated Heard to begin drilling within a year or pay rentals in lieu of drilling.

The 17 landowners appear to have pooled their holdings and interests, and on February 26, 1918, jointly entered into a drilling contract with Heard, by which the latter obligated himself to drill an oil and gas well "somewhere on the lands embraced in the pool of acreage," upon the land of "one" of the 17 owners. A few weeks later, on April 4, 1918, G. S. Britton, a member of the pool, entered into an individual contract with Heard, who thereby obligated himself to drill a well on Britton's 480-acre tract embraced in the pool. It was stipulated that the well should be commenced within 90 days, and that drilling should be diligently prosecuted to a depth of 4,000 feet, unless oil or gas be found in paying quantities at a lesser depth. This contract was duly recorded in the deed records of Erath county.

The two drilling contracts appear to have been made independently of and without specific relation to the leases held by Heard upon the lands to be drilled. And it does not appear that any character of consideration induced the parties to execute them. No penalty was prescribed against Heard's default in performance, and such default could not have impaired or affected his leases upon the lands.

On June 13, less than 90 days after the execution of his drilling contract with Britton, Heard assigned his lease on Britton's 480-acre tract to S. F. Cade, but no reference was made in this assignment to the drilling contracts, which seem to have been completely ignored then and thereafter, so far as the record shows. On October 29, 1918, Cade assigned the west 200 acres of the Britton lease to M. H. Thomas and others, who appear to have been the trustees of the Cotton States Petroleum Company, which is an unincorporated concern, operating under a declaration of trust.

It was provided in Heard's drilling contract with Britton that a well should be commenced on the latter's land within 90 days from April 4, 1918. Nothing was done within this period, however, except that a derrick was set up by "Old Man Winters," a stranger

not otherwise identified in the record. About this time one H. C. Cates appeared on the scene, "who seemed to be the general manager in connection with the drilling of the well," with whom Britton dealt from then on. After the derrick was set up nothing further was done towards drilling for two or three months, when Britton, impatient at the delay, complained to Cates, who appears to have been acting for M. H. Thomas of Dallas, one of the trustees of the Petroleum Company. In the meantime it appears that Britton had given Cates a 15-day extension of time in which to begin drilling, but no material progress was made under this extension. Drilling operations had not actually commenced prior to January 18, 1919, when the petroleum company executed and delivered the following bond to Britton (omitting formal parts):

"Know all men by these presents: That Cotton States Petroleum Company as principal and the others whose names are hereto signed as sureties acknowledge ourselves bound to owe and pay G. S. Britton of the county of Erath, in the state of Texas, the sum of twenty thousand dollars, for the payment of which we hereby bind ourselves, our heirs, executors and administrators, the conditions of this obligation being: That whereas, the above named Cotton States Petroleum Company has contracted and agreed with the said G. S. Britton to drill a well for oil and gas on the C. Schaffer survey in Eastland county, on land on which the said Cotton States Petroleum Company now owns the lease; and whereas, operations for the drilling of said well have been begun but said well has not been spudded in:

"Now, therefore, if the said Cotton States Petroleum Company prosecutes the operations already commenced for the drilling of said well with due diligence and shall spud in said well in at the earliest practicable date and shall drill the same to completion, then this obligation shall be null and void—otherwise to remain in full force and effect."

The Petroleum Company spudded in the well and drilled it to a depth of approximately 3,800 feet, when operations ceased. No oil was found by this operation. About a year's time was consumed in drilling the well. The evidence was such as to raise the issue of diligence, and that issue, if material, should have been submitted to the jury. The evidence was also sufficient to raise the issues of Cates' authority and agency for the petroleum company, and of the latter's ratification of his acts, and if those issues were material they, too, should have been submitted to the jury.

Britton brought this suit upon the drilling bond against the Petroleum Company as an unincorporated association, against its trustees as such and individually, and against the sureties on the bond. The case was tried by jury, but when Britton put on his evidence and rested his case, the trial court directed a verdict for all the defendants. Brit-

ton has appealed from the resulting adverse judgment.

It is necessary at the outset to determine the nature and extent of the obligation imposed upon the petroleum company as the principal in the bond sued on. It is contended by appellant that the company's obligation must be determined by the provisions in the drilling contracts made between Heard and Britton on April 4, 1918, whereby Heard was required to diligently drill a well to a depth of 4,000 feet, unless pay production was encountered at a lesser depth; that the provisions in this drilling contract constituted covenants running with the lease obtained by Heard and subsequently acquired by the petroleum company. We cannot uphold this contention.

[1] The Heard drilling contract was not incorporated in the bond here sued on; was not made a part of the bond; was not referred to in the bond, directly or by implication. It was not referred to in the lease contract, nor in any assignment of that lease, which was assigned by Heard and acquired by the petroleum company independently of and without reference to the drilling contract. The result is that the covenants in the latter were independent of, and separate and apart from, and in no way ran with, the covenants in the lease. So, in acquiring the lease, the obligation of the petroleum company to develop the land was ascertainable and determinable solely by the covenant in the lease to commence a well within a year or pay rentals in lieu of drilling.

It follows from this conclusion that the parties were relegated to the provisions of the bond to ascertain the nature and extent of the obligation of that instrument. It is there provided that—

"If the said Cotton States Petroleum Company prosecutes the operations already commenced for the drilling of said well with due diligence and shall spud in said well in at the earliest practicable date and shall drill the same to completion, then this obligation shall be null and void—otherwise to remain in full force and effect."

[2, 3] This provision is in effect that the petroleum company should diligently drill the well in question to completion. Appellant contends that the obligation was to perform three distinct operations: First, to prosecute the operations already begun for drilling; second, to spud in the well; and, third, to drill the well to completion. This appears to be a fanciful analysis of the obligation, however. When the language of the bond is construed practically, as it should be, it simply obligated the Petroleum Company to diligently proceed with and complete the drilling of the well as located and begun; it was an indivisible obligation. To complete the well was to drill it to whatever depth was reasonably required to ascertain if oil or gas in

paying quantity underlaid the surface, or to that depth at which the product was usually proven or disproven in that locality. This was a question of fact, to be determined by the jury, from the evidence in the case. If the petroleum company drilled the well to such depth, and within a reasonable time, under all the facts and circumstances of the case, then the obligation of the bond was discharged; if not, then the company was in default. This, too, was an issue of fact to be found by the jury.

[4] It now remains to be determined whether the sum named in the bond was fixed as a penalty to be assessed against the obligor in event of his default, or as liquidated damages to be paid the obligee in that event. The intention of the parties will be given effect in determining whether the amount designated in the bond shall be treated as a penalty or as liquidated damages.

[5, 6] In ascertaining the intention of the parties, it is incumbent upon the courts to look to the language of the instrument; to the nature of the transaction; to the object to be attained by the undertaking for the performance of which the bond is given; to all the conditions and circumstances surrounding the project. Unless it is clearly expressed in the bond, or so understood by the parties thereto, that the sum stipulated in the instrument is intended as liquidated damages to be paid in case of default, it will be treated merely as a penalty, or the maximum amount recoverable as damages in that event. In such case the recovery will be measured by the actual damages sustained by the obligee. It was said by Judge Gaines, in Eakin v. Scott, 70 Tex. 442, 7 S. W. 777:

"The courts strongly incline to treat all agreements to pay a lump sum, in case of the failure to perform the terms of a contract, as a mere penalty, and in all doubtful instances to allow a recovery only for the actual damages."

[7, 8] If the nature of the contract to be performed is such that it is impossible to measure or approximate the damages flowing from a breach of the contract, and the stipulation is for a specific sum arbitrarily fixed as liquidated damages, then the amount will be so treated, if it appears that the obligee in the bond has been injured by a breach of the contract. But in any event, if it affirmatively appear that the obligee has suffered no damages as a result of the obligor's default, then as a matter of equity he will not be permitted to recover, even though the stipulation is for liquidated damages in a sum certain, unless, indeed, that purpose is clearly expressed in the bond.

[9] Nothing could possibly be more uncertain than the results which are to follow the drilling of an oil well. These results may be advantageous to the landowner, or, they may be disastrous to him; they may enrich him, or they may destroy his hope of enrichment from that source. They can never be foretold; they remain a matter of the purest conjecture so long as the operation is uncompleted. If oil in paying quantities is found, the owner as a matter of course is benefited, at least in a pecuniary sense; if a dry hole results, he is, also as a matter of course, not benefited pecuniarily. The commencing of the drilling of the first well on his land usually has the immediate effect of creating a market for his royalty interest on that tract and the royalty and rental values of his adjoining tracts, if he has any, or of enhancing an existing market for both royalty and rentals; and continued drilling of the well usually sustains and often enhances those values. If the drilling operations cease before reaching the probable or expected pay depth, then the royalty and rental values may depreciate or be destroyed, according to the circumstances of the case. But, if the operation is completed without discovery of oil, and the premises thereby disproven, then usually both the royalty and the rental values of the immediate and adjacent premises are thereby destroyed. None of these contingencies can be foretold by human agencies. This being true, the advantage to be derived by the landowner from the diligence of the driller is wholly problematical. If production is to result from the operation, the owner will usually profit by speedy development; if production is not to be had by the operation, the owner cannot profit by the speedy drilling of the well, and usually it is to his advantage if the development is retarded, so that he may have more time within which to dispose of his royalty and other leases, both of which are rendered valueless by the completed operation which disproves his land. These reflections are pertinent to the question of the intent of the parties in fixing the amount of the bond here in question, as well as to the question of damages.

[10] The language of the bond here sued on does not disclose or suggest whether the amount stipulated in the instrument was intended as a penalty or as liquidated damages, and, in order to determine the question, it therefore becomes necessary to look to the nature of the contract to be performed, the situation of the parties, and the objects to be accomplished by the project. The evidence discloses that in fixing the amount of the bond the parties did not discuss the nature or extent of the damages likely to result from a breach of appellees' obligation to diligently prosecute the drilling of the well to completion. As a matter of common knowledge, they could not have intelligently considered or discussed or agreed upon such damages, since in the very nature of the undertaking they could not possibly have foreseen the consequences of an unreasonable delay in the operation, or even determined that a delay would have injured appellant or would not have benefited him. As a matter

of fact, too, it affirmatively appears from the evidence that appellant sustained no injury or damage whatever from the apparently unusually long time consumed by appellee in drilling the well. It may be said, moreover, that appellant profited, if anything, by the delay, since it appears that because of this and other nearby operations, and before the lease was disproven by this operation, he was enabled to sell off some of his royalty for $22,000; whereas, if he had retained it until appellee finished the well into a dry hole, his royalty would have been worthless. In the meantime, however, other operations in the vicinity resulted in defining the limits of the Desdamona pool and placing this well outside those limits. Thus, because of a prospect of production from appellant's premises, and because this well and others in that vicinity had not been completed into dry holes, as they finally were, appellant profited to the extent of $22,000, as well as of the bonuses obtained from his leases.

However, as has been shown, the parties to the drilling contract and bond to enforce it could not have had in mind or contemplated or intelligently agreed upon the sum fixed in the bond as the probable amount of damages to result from appellee's default in its obligation to diligently bring in the well in question. We are relegated, then, to the final and controlling question of whether under the facts shown appellee is liable to appellant in the full amount arbitrarily stipulated in the bond, assuming, for the purpose of determining the question, that appellee was in default.

Ordinarily, where the contract fixes a specific sum to be paid the obligee in case of the obligor's default, and the damages resulting from such default are substantial, but so uncertain or intangible in nature that the amount thereof cannot be ascertained or approximated, the sum fixed in the instrument will be treated as liquidated damages, to be measured by the amount specified in the contract. In this case the damages in any event would have been so uncertain that they could not have been measured, and, had it appeared that damages of a substantial nature had been sustained by appellant, or the record had been silent upon that issue, and a default reasonably established, then we would be disposed to hold that the case was one of liquidated damages to be measured by the amount nominated in the bond.

[11] But we conclude, under the facts peculiar to the case made, that in the absence of an agreement that the sum named was to be paid as liquidated damages in event of default and without regard to injury, the obligee will not be permitted to recover in the face of his own testimony that he was in no way injured by the obligor's default, if any. To permit a recovery of the full amount of the large bond in such case would be unconscionable; and, there being no injury to appellant, there is no basis or measure or reason for the recovery of a lesser amount.

The judgment is affirmed.